**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAYTHEON TECHNOLOGIES CORPORATION PENSION ADMINISTRATION AND INVESTMENT COMMITTEE, | Case No. 21 Civ. 3116 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| ALLIANZ GLOBAL INVESTORS U.S. LLC | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff, the Raytheon Technologies Corporation Pension Administration and Investment Committee, as a fiduciary for the Raytheon Technologies Corporation Master Retirement Trust and successor to certain prior fiduciaries for the Raytheon Master Pension Trust (collectively, the "Plan Fiduciary"), brings this Complaint against Defendant Allianz Global Investors U.S. LLC ("Allianz") to recover the hundreds of millions of dollars in losses that the Raytheon Technologies Corporation Master Retirement Trust, as successor in interest to the Raytheon Master Pension Trust (collectively, the "Trust"), suffered as a result of Allianz's mismanagement of the AllianzGI Structured Alpha U.S. Equity 500 LLC.

**NATURE OF THE CLAIMS**

1.      The Trust holds the assets of tax qualified defined benefit pension plans sponsored by Raytheon Technologies Corporation or its affiliates (the "Plans") to provide retirement income to participants and their beneficiaries.

2.      Acting through its trustee, the Bank of New York Mellon, and on the authority of the Plan Fiduciary, the Trust invested a portion of the Plans' assets in AllianzGI Structured Alpha U.S. Equity 500 LLC (the "Fund").  Allianz was the Fund's managing member.

3.      Allianz courted retirement plans to invest in the Fund, promising them that structural risk protections were the cornerstone of the Structured Alpha strategy.  While the Fund was designed to generate returns through an options trading strategy, Allianz promised that hedges would be in place "at all times" to cap the downside risk of that strategy.  Allianz told investors that these hedges would limit investment losses to a "defined maximum loss," afford "reinsurance" against a market crash, and eliminate the risk of a margin call.  Allianz also promised that it would "never" forecast the direction of the market or market volatility, that Structured Alpha's investment strategy was "non-directional," and that it would "perform whether equity markets are up or down, smooth or volatile."

4.      These claimed risk protections were critical to the decision by the Plan Fiduciary to invest the Plans' assets in Allianz's Structured Alpha investment strategy, and the Fund in particular.

5.      Yet when equity markets declined, volatility spiked, and the Fund's option positions were exposed to a heightened risk of loss in February and March 2020, Allianz's promised protections were absent.  Unbeknownst to the Plan Fiduciary or anyone at Raytheon, and in violation of Allianz's stated investment strategy and the fiduciary duties it owed under the Employee Retirement Income Security Act of 1974 ("ERISA"), Allianz had abandoned the hedging strategy that was the supposed cornerstone of Structured Alpha, leaving the portfolio almost entirely unhedged against a spike in market volatility.  To make matters worse, Allianz

had placed a directional bet that volatility would remain relatively low, the equivalent of a ticking time bomb if its forecast (one it had promised "never" to make) proved false.

6. As Allianz has since admitted, it constructed the Fund's portfolio to offer no downside protection against the market decline and volatility spike that occurred in February and March 2020. Contrary to its promise to investors that it would always purchase hedges as "reinsurance" for the options it sold, Allianz had purchased **no** hedges for an entire segment of the portfolio. Meanwhile, the so-called hedges that Allianz did purchase were not the hedges Allianz said it would buy. Whereas Allianz had told the Plan Fiduciary that it would buy hedges at a strike price 10% to 25% below the market price, the hedges it actually held at the end of February 2020 were as much as 60% below the market price. Given these and other departures from the Fund's purported Structured Alpha investment strategy, Allianz had constructed the Fund's portfolio not to pursue "risk-managed returns" as it had promised but instead to earn marginal returns selling insurance against market volatility while maintaining no meaningful protection against the downside associated with the large tail risk of a market collapse—a strategy that has been aptly described as picking up pennies in front of a steamroller.

7. In further derogation of its duties and scrambling to address the fallout from its imprudent management, Allianz added yet more risk to the portfolio in February and March 2020. Whereas Allianz said it would purchase **and maintain** hedges that would automatically cap the "maximum loss" the Plans could sustain in a market downturn, Allianz **sold** the hedges that could have protected their investment and then added more risk-bearing positions in an apparent bet that the market would recover. These new risk-bearing positions were also built without an appropriate hedge in place, exposing the Fund to further, catastrophic losses and ultimately the threat of a margin call that Allianz had said could never happen.

8.      Allianz's reckless actions, both in constructing the Fund's portfolio to bear excess, undisclosed risk and in restructuring the portfolio to chase returns rather than preserve investor capital, reveal that Allianz placed its own interests in generating performance fees ahead of its duty to safeguard the Plans' assets against undue risk.  Allianz did not charge investors an asset-based investment management fee, but rather a 30% performance fee on investment returns exceeding a certain minimum investment return benchmark.  Because of the Fund's asset size, the marginal investment returns that Allianz sought by abandoning structural risk protections represented a potentially significant increase in Allianz's performance fee compensation.  This was especially true in February and March of 2020, when the Fund had suffered extraordinary losses and Allianz knew that it needed to generate enormous returns just to return to the high-water mark at which it could hope to earn any fees.

9.      The resulting losses to the Trust are staggering.  As of January 31, 2020, the Trust had approximately $375 million of the Plans' assets invested in the Fund.  By the end of March, the Trust had lost about 75% of that investment—about $280 million.  These losses far exceed what the Trust would have lost had Allianz managed the Fund prudently or had the Plans' assets been invested in an S&P 500 index fund or in a comparable but prudently managed investment strategy.  As a result of Allianz's breaches, a substantial portion of the Plans' assets meant to provide retirement security to the Plans' participants and their beneficiaries was wiped out.

10.      Allianz breached its obligations as an ERISA fiduciary and the duties it otherwise owed to the Trust.  Those breaches caused the Trust to suffer devastating losses.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1367 and under ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).

4

12.     Venue in this judicial district is proper under ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) and 28 U.S.C. § 1391(b).  Allianz has also consented to venue in this judicial district.

## PARTIES AND OTHER ENTITIES

13.     Plaintiff, Raytheon Technologies Corporation Pension Administration and Investment Committee, is a fiduciary for the Raytheon Technologies Corporation Master Retirement Trust, successor in interest to the Raytheon Master Pension Trust.  On April 3, 2020, United Technologies Corporation acquired Raytheon Company by merger and United Technologies Corporation changed its name to Raytheon Technologies Corporation ("Raytheon Technologies").

14.     On December 1, 2020, Raytheon Master Pension Trust, a master trust that held the assets of employee pension benefit plans sponsored by Raytheon Company or its affiliates, merged into Raytheon Technologies Corporation Master Retirement Trust, a master trust holding the assets of employee pension benefit plans sponsored by Raytheon Technologies or its affiliates.

15.     Raytheon Technologies has a principal place of business in Waltham, Massachusetts.  The Plans are employee pension benefit plans under ERISA § 3(2)(A) (29 U.S.C. § 1002(2)(A)).  Raytheon Technologies appointed the Plan Fiduciary to oversee the investment of Plan assets and monitor the Plans' financial stability.  The Plan Fiduciary is the named fiduciary of the Plans under ERISA § 402(a)(2) (29 U.S.C. § 1102(a)(2)).  The Plans' assets were held, at all relevant times, in the Trust.

16.     Defendant Allianz Global Investors U.S. LLC is a Delaware limited liability company and registered investment adviser under the Investment Advisers Act of 1940 with its

principal place of business in New York, New York.  In 2019, Allianz became a fiduciary

investment manager within the meaning of ERISA § 3(21)(A)(i), (38) (29 U.S.C.

§ 1002(21)(A)(i), (38)) for the Trust's investment in the Fund.  As of December 31, 2019,

Allianz managed more than $140 billion in client assets.  Allianz is part of "Allianz Global

Investors," the marketing name for a global asset management business operating through

affiliated entities around the world.  Allianz's ultimate corporate parent is Allianz SE, which is

headquartered in Germany.

17.     Allianz Global Investors U.S. Holdings LLC is Allianz's sole member.  It is also a

Delaware limited liability company with its principal place of business in New York.

18.     PFP Holdings, Inc. is the sole member of Allianz Global Investors U.S. Holdings

LLC.  It is a Delaware corporation with its principal place of business in California.  It is owned

indirectly by Allianz SE.

## FACTUAL ALLEGATIONS

### Allianz Markets the Structured Alpha Strategy

19.     Allianz told the Plan Fiduciary that Structured Alpha was an "enhanced large cap

equity strategy" that "pursues outperformance via the options market."

20.     The Structured Alpha strategy consists of alpha and beta components.  The beta

component is intended to provide broad market exposure to a particular asset class through

investments in financial products (like an exchange-traded fund) that replicate the performance

of a market index.  The alpha component is an options trading strategy that Allianz claimed

would seek excess returns, beyond the passive returns earned on the underlying beta investment,

while nonetheless maintaining structural risk protections that would ensure a "risk-managed

potential return."  The options Allianz claimed to be trading were "simple, liquid, [and]

transparent." The alpha component, according to Allianz, "should exhibit low or no correlation" to the beta exposure.

21.     Allianz implemented the Structured Alpha strategy in numerous funds and products that it offered to investors. The options strategy was largely the same, however, regardless of the fund or its underlying beta component.

22.     Allianz touted the strategy as "non-directional," meaning it was not predicated on correctly taking a view on the direction of equities, interest rates, or other fundamental factors. As a result, Allianz represented that the options strategy would "never make a forecast on the direction of equities or volatility."

23.     As for the structural risk protections supposedly inherent in the strategy, Allianz claimed that Structured Alpha would combine both "long and short volatility" positions "at the same time, at all times." While the strategy would generate returns by selling options (i.e., short volatility), Allianz said it would simultaneously buy options "to protect the portfolio in the event of a market crash" (i.e., long volatility).

24.     The building blocks of Allianz's strategy were supposed to be three types of positions: (1) range-bound spreads; (2) directional spreads; and (3) hedging positions.

25.     The range-bound spreads, Allianz represented, are "short volatility" positions that are "designed to generate returns in normal up, down or flat markets." Allianz explained that, based on its proprietary analysis, Structured Alpha employs short put and call options to create "profit zones that have a high probability of success upon expiration of the options." The profit zones aim to catch the underlying equity index inside their upper and lower bands at expiration. If the equity index finishes inside the profit zone at expiration, the strategy will profit, according

to Allianz.  Allianz claimed these range-bound spreads generated roughly two-thirds of the options strategy's return.

26.    The directional spreads, Allianz represented, are combination "long-short volatility" positions "designed to generate returns when equity indexes rise or fall more than normal over a multi-week period."  These spreads are built by buying and selling options to both the upside and downside in order to create "profit zones" several percentage points away from current equity index levels.  According to Allianz, these spreads are set up to "benefit from a large index move to the upside and/or downside" and to "act as portfolio diversifiers."  Allianz claimed they accounted for roughly one-third of the options strategy's return.

27.    Allianz depicted the range-bound spreads and directional spreads as follows, with the so-called "profit zones" in blue compared to the "loss zones" in gray:



28.     Allianz represented that the hedging positions would be the third component of Structured Alpha and a cornerstone of the strategy.  These are "long volatility" positions that Allianz told the Plan Fiduciary are "designed to protect the portfolio in the event of a market crash."  Allianz claimed it would purchase hedges out of the money that were "laddered for various market outcomes to the downside" and "in a greater quantity than" the puts it sold.  Allianz emphasized that the hedges would be in place "at all times."

29.     Allianz depicted the long-put hedging positions as follows, illustrating (as Allianz commonly represented) that it would purchase the hedging positions "-10% to -25%" out of the market:



30.     Allianz also told investors that the hedges would eliminate the risk of a margin call.  In an April 2017 pamphlet, for example, Allianz proclaimed that "***under no scenario* can**

an equity-market decline cause our portfolio to experience a margin call."[1]  Structured Alpha's supposed immunity to margin calls was, according to Allianz, "a crucial differentiator from many option strategies."

31.  Allianz regularly analogized Structured Alpha's three-pronged, long-short investment design to selling "insurance" against market volatility (referring to the range-bound and directional components of the strategy) and buying "reinsurance" to protect from downside risk in the event such volatility was experienced (referring to the hedging component of the strategy).

32.  Allianz told investors to think of put options as "insurance policies for equity investors."  And it explained that "sometimes it is advantageous to be the owner of the insurance policy, while other times it is advantageous to be the insurance company selling the policy." "We aim to be both," Allianz told investors.

33.  Greg Tournant, Allianz's chief investment officer for U.S. structured products and the architect of Structured Alpha, consistently used the insurance/reinsurance analogy to describe the strategy he developed.  In a May 2016 interview, Tournant said that Allianz is "acting like an insurance company" when it "collect[s] premium" by selling options.  Although Allianz may have to "pay very much like an insurance company" if a "catastrophic event" occurs, Tournant reassured the audience that Structured Alpha's hedging positions would act as "reinsurance" to "protect the portfolio."  And Tournant emphasized that he and his team at Allianz considered themselves "risk managers first and return managers second."

34.  Allianz also promoted the close relationship with its ultimate corporate parent, Allianz SE, in marketing Structured Alpha to the Trust and the Plan Fiduciary.  Allianz claimed,

---

[1] All emphases are added unless otherwise noted.

consistent with the unified risk management framework that Allianz SE touts in its annual

reports, that risk was "continuously managed and monitored" at the "firm level," and that its

risk-management strategy adhered to Allianz SE's standards.  Allianz told the Plan Fiduciary that

it was assisted in these risk management efforts by IDS GmbH, a wholly owned subsidiary of

Allianz SE, that supposedly provided Allianz ongoing risk analysis reports.  Allianz's direct

parent, Allianz Global Investors U.S. Holdings LLC, purportedly oversaw Allianz's day-to-day

portfolio management and investment operations, including risk management.

### Raytheon Trust Invests in Structured Alpha

35.     The Trust made its initial investment in AllianzGI Structured Alpha U.S. Equity

500 LLC (the "Fund") on August 28, 2019.  The initial investment in the Fund was $330 million.

36.     The Fund was organized as a limited liability company of which Allianz was the

managing member.  The Trust's investment of the Plans' assets in the Fund was subject to a

collection of agreements that memorialized various duties Allianz had promised to undertake.

These agreements include the AllianzGI Structured Alpha U.S. Equity 500 LLC Private

Placement Memorandum (the "PPM"), the AllianzGI Structured Alpha U.S. Equity 500 LLC

Limited Liability Company Agreement (the "LLC Agreement"), the AllianzGI Structured Alpha

U.S. Equity 500 LLC Subscription Agreement (the "Subscription Agreement") and a Side Letter

Agreement, dated September 1, 2019, between Allianz as Investment Manager and the Plan

Fiduciary.

37.     Under the LLC Agreement, for example, Allianz undertook the duties of a

fiduciary under ERISA—the highest duties known to the law.  "In the event that any assets of the

[Fund] are subject to fiduciary rules of [ERISA]," Allianz "in its capacity as investment manager

of the [Fund], acknowledges that it will be a fiduciary with respect to such assets."  Because the

Plans' assets held in the Trust and invested in the Fund were subject to ERISA's fiduciary rules at all relevant times, Allianz was "a fiduciary with respect to such assets" at all relevant times.

38.     "Additionally," the LLC Agreement continues, "to the extent that the underlying assets of the [Fund] constitute 'plan assets' within the meaning of ERISA and the regulations thereunder," Allianz "in its capacity as 'investment manager' of the [Fund], shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA." During any such time that the Fund is "regarded as 'plan assets' for purposes of ERISA," Allianz agreed further in the PPM that it "will be a 'fiduciary' (as defined by ERISA) with respect to any investing ERISA plan and will be subject to the obligations and liabilities imposed on fiduciaries by ERISA."  Those obligations, the PPM continues, include "certain restrictions on self-dealing and conflicts of interest" and require Allianz "to avoid causing the Fund to engage in transactions with parties in interest of investing ERISA plans."

39.     Even if "the underlying assets of the [Fund] do not constitute Plan Assets," Allianz promised in the LLC Agreement to "use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under [ERISA]."  "Under that standard," Allianz agreed in the PPM, it "will be required to exercise the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

40.     Furthermore, Allianz accepted appointment as a fiduciary "investment manager of the [Fund]" in the LLC Agreement.  Allianz's responsibilities as investment manager included "advising regarding the purchase and sale of investments," "arranging financing for the acquisition of investments and other assets," "conducting, or supervising third parties who

conduct, investigations of investments," and "managing the [Fund's] assets."  And so long as

Allianz "is an 'investment manager'" within the meaning of ERISA, Allianz acknowledged in

the PPM that "the trustees and other fiduciaries of an investing ERISA plan . . . generally will be

relieved of their obligations with respect to the investment and management of plan assets under

[Allianz's] management and control."

41.     The LLC Agreement also provides that Allianz may be liable to the Trust for

losses sustained by the Fund or its investors "arising from" Allianz's "bad faith, willful

misconduct or negligence."

42.     Furthermore, in the Side Letter Agreement, Allianz stated that "[i]f the Fund's

assets are or are permitted to become 'plan assets' under [ERISA,]" Allianz "shall comply with

the duties and responsibilities imposed upon a fiduciary under ERISA with respect to the assets

of each plan that are invested in the Fund."

**Allianz Promises a Hedging Strategy to Manage Risk in a Low-VIX Environment**

43.     When Allianz presented Structured Alpha to the Plan Fiduciary, Allianz sought to

assure the Plan Fiduciary that the Fund was poised to deliver returns (and mitigate losses) in the

event of a market downturn.  To that end, Allianz promised that it had implemented a "Low

VIX" hedging configuration, which Allianz claimed would better protect the options portfolio in

the event of a steep decline in equity markets.

44.     The gist of this configuration was that Allianz would purchase fewer hedges but

buy them closer to the money when building positions in a low-VIX environment.  By doing so,

Allianz claimed it would create "sealed" range-bound spreads with a defined maximum loss.

Thus, rather than restructuring as Allianz had at times done when markets fell in the past, Allianz

would now leave its positions alone—they would require "no intervention."

45.     Allianz provided the Plan Fiduciary with a diagram of the "tactical placement" of

the strategy's hedging positions that would create a defined "Max Loss" for the portfolio when

those positions were built in a "Low VIX" environment:



46.     The "sealed" spreads, Allianz claimed, would "[i]mprove[] the portfolio's ability

to navigate difficult V-shaped equity and volatility moves" and better equip the portfolio to

handle sharp moves that begin in low-volatility environments.

47.     In a quarterly update Allianz provided to investors on Structured Alpha at the end

of September 2019, Allianz hailed the low-VIX hedging strategy's early successes: "The S&P

500's correction in early August provided a second successful test case for the new hedging

configuration that we began implementing this year."  These results demonstrated, according to

Allianz, "our improved ability to navigate sharp market declines that are preceded by low-volatility environments."

48.    Allianz made additional representations to the Plan Fiduciary about Structured Alpha.  For example, Allianz summarized the strategy as pursuing "risk-managed" returns. "Risk is continuously managed and monitored," Allianz claimed, "at both the portfolio level by the investment team and the firm level."  And Allianz repeated aspects of its investment philosophy that it claimed to follow, including the mantras "Never make a forecast on the direction of equities or volatility" and "Prepare for the unexpected; pre-develop plans in anticipation of scenarios in which the portfolio could be at risk for losses":



Allianz thus represented that Structured Alpha was "[d]esigned to outperform irrespective of the market environment."

49.     Based on Allianz's representations, the Plan Fiduciary reasonably understood that Allianz was not selling "naked" options, *i.e.*, options without any corresponding hedge in place. Rather, Allianz indicated that for every option it sold, Allianz bought a corresponding hedge as "reinsurance" to limit the risk of loss in case of market turbulence.  Allianz gave the Plan Fiduciary the impression that the hedging positions placed to protect against downside losses would be appropriately matched to the risk-bearing positions (*i.e.*, they would "reinsure" the same risk) and that Allianz would never sell any "naked" options.

### Allianz Abandons the Risk-Managed Investment Strategy It Had Represented

50.     Allianz often touted its supposed fidelity to Structured Alpha's stated investment strategy.  Yet by 2019, shortly after and perhaps even before the Plans' assets were invested, Allianz had abandoned the investment strategy it professed to follow.  Rather than maintaining the risk profile it had promised, Allianz was taking imprudent actions that added excess and undisclosed risk to the Fund's portfolio—in effect, leaving the portfolio unhedged in certain market scenarios and placing a directional bet against market volatility—with the hopes of chasing additional return, all unbeknownst to the Plan Fiduciary.

51.     Juicing the strategy's returns would increase Allianz's fees.  Allianz did not charge an asset-based management fee to operate Structured Alpha.  Rather, Allianz received 30% of any gains relative to the Fund's benchmark index.  If Allianz underperformed, it received nothing.

52.     One example of Allianz's imprudence was its decision to purchase hedging puts further out of the money than Allianz had represented to the Plan Fiduciary.  Allianz claimed time and again that its long puts would be struck "-10% to -25%" below the market.  When Allianz diagramed the hedging component, it depicted a hedge at the bottom end of that range—

25% below the market—even in the "normal configuration" where (unlike in the "low VIX configuration") the long puts were expected to be further out of the money.

53.    In fact, Allianz was purchasing hedging puts that were significantly further out of the money than Allianz had represented they would be.  Those puts were cheaper and therefore less of a drag on the fee-generating returns Allianz could hope to produce.  By purchasing cheap puts that were far out of the money, Allianz could inflate profits from its range-bound and directional spreads, thereby increasing Allianz's fees, and still claim that it was buying hedges (though those hedges had the potential to be virtually worthless in certain market scenarios when they would be most needed).  But the gulf between Allianz's offensive, return-generating positions and its defensive ones left the portfolio effectively unhedged and exposed the Trust to potential catastrophic losses (that Allianz would, of course, not share with the Trust) far beyond those Allianz had presented as possible.

54.    Another example of Allianz's imprudence was its decision to buy hedging puts that expired sooner than the risk-bearing options it sold.  Allianz had represented that the long puts would be of the same or similar duration as the short puts.

55.    The puts Allianz purchased as supposed "reinsurance" expired far earlier than many of the puts it was selling, meaning there was, as Allianz has admitted, a "duration mismatch" between the options Allianz was short and those it was long.  Allianz bought these shorter-dated puts because, again, they were cheaper.  By purchasing less expensive, shorter-dated puts and selling more expensive, longer-dated puts, Allianz essentially bought less "reinsurance" than it had promised.  Doing so allowed Allianz to increase the returns from its range-bound and directional spreads, thereby increasing Allianz's fees.

56.     Again, Allianz departed from the strategy it had represented to the Plan Fiduciary and, in doing so, Allianz layered excess and undisclosed risk on the Fund's portfolio.  Allianz was apparently betting that it would be able to effectively replace the hedges as they expired, even in a declining market.  That bet left the portfolio exposed to the risk that in a rapidly deteriorating market Allianz would be unable to backfill the hedges it should have had in place all along.

57.     Perhaps the most glaring example of Allianz's imprudence, however, was its decision not to acquire any hedges for the return-generating options it sold on volatility indexes. In addition to buying and selling options on an equity index like the S&P 500, Allianz disclosed that as part of the Structured Alpha strategy it would buy and sell options on volatility indexes such as the VIX or the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"). Because these options would be part of the return-generating portions of the strategy (and introduce risk as a result), they would also need to be appropriately hedged.  In the same way that Allianz bought long puts on the S&P 500 to hedge against a decline in the equity markets, it would need long positions on the VIX to hedge properly against a spike in volatility.

58.     Allianz, however, was taking on the risk of selling VIX options without buying any corresponding hedge.  To borrow from Allianz's analogy, it was selling insurance against market volatility without any reinsurance against the risk that entailed.  Far from "never" making a forecast on the direction of volatility—a supposed pillar of the Structured Alpha investment philosophy, according to Allianz—Allianz was gambling that the VIX would remain relatively low so its unhedged short positions would not be exposed to catastrophic losses.

59.     Allianz was making that bet despite knowing that the VIX was becoming increasingly sensitive to market movements.  In a December 2019 quarterly update to investors

in Structured Alpha, Allianz claimed that the recent "sensitivity of the VIX" was "advantageous" for Structured Alpha. A "typical response," Allianz explained, "is for the VIX to rise 10 to 20 times more than the S&P 500 declines." But in early December 2019, Allianz observed a VIX increase "100 times larger than the index move." Even though Allianz had identified that the VIX was becoming prone in late 2019 and early 2020 to sudden, larger-than-expected increases, Allianz continued to short volatility options—betting that the VIX would remain relatively low—without any corresponding long positions to hedge against a spike in the VIX.

60.    In all cases—whether purchasing puts too far out of the money or purchasing puts with shorter expiration dates than the puts it sold or shorting the VIX without any corresponding hedge in place—Allianz's motivation was self-interest, not the best interest of the Plans' participants and beneficiaries. And in all cases, Allianz had departed from the prudent strategy it had represented it would pursue, adding excess and undisclosed risk out of line with the risk parameters Allianz had pledged to follow.

61.    The Plan Fiduciary did not know that, going into the market dislocation of February and March 2020, Allianz had departed from its professed investment strategy and was instead layering excess risk into the Fund. The strategy was apparently performing as Allianz said it would, meaning that any losses experienced in a market dislocation could be expected to be short-term, mark-to-market losses that could be recovered in subsequent months. And Allianz represented that the Fund's portfolio was, if anything, better positioned to handle a market downturn than it had been in the past.

62.    The most significant modification to the Structured Alpha investment strategy that Allianz had brought to investors' attention was one that purportedly **_enhanced_** the portfolio's ability to navigate a market decline. In its communications to investors, Allianz touted its "new

hedging configuration," which Allianz said gave the portfolio an "improved ability to navigate sharp market declines that are preceded by low-volatility environments" and "made the option portfolio more resilient."  Although it trumpeted this "refinement[]" to the investment strategy in investor updates, Allianz did not tell the Plan Fiduciary of its other changes to Structured Alpha's investment strategy—namely, that it was making a directional bet that volatility would remain low, selling naked options, and buying hedges much further below the market than it should have under its professed investment strategy.

**Allianz's Breaches Cause Catastrophic Losses**

63.     Going into the market turmoil of February and March 2020, Allianz did not have in place appropriate hedging positions to protect the portfolio (as it claimed it would) and then it sold many of the hedges it did have (as it claimed it would not do).  As a result, Allianz caused the Trust to suffer catastrophic losses in a matter of weeks.

64.     Throughout January and into late February 2020, the VIX remained relatively low and the S&P 500 remained relatively stable.  The market began to decline and volatility spiked, however, in the second half of February and March 2020.  This led to a precipitous drop in the Fund's value.

65.     On a March 3 conference call with the Plan Fiduciary's staff, Allianz reported that the Fund underperformed substantially in February, trailing the S&P 500 by 10%.  However, Allianz stated that it "expect[ed] an underperformance" and assured the Plan Fiduciary that the Fund would "be in good positions for positive alpha soon."

66.     If Allianz had been managing the portfolio in the manner it claimed it would, Allianz would (among other things) have constructed the hedging positions closer to the market and left those hedges in place to secure the defined "Max Loss" if the market declined.  That was the "new configuration" strategy—touted to investors as the product of years of research and

development—that Allianz had promised to deploy in a low-VIX environment like the one that existed for the first six weeks of 2020.

67.     Yet, as Allianz later acknowledged, it had sold the new-configuration hedges— *i.e.*, the hedges that were supposed to be locked in to contain potential losses.  According to contemporaneous email correspondence, Allianz had struck the puts "7% to 9%" out of the money.  But when the market declined, these "new-configuration puts were shifted," meaning Allianz sold them and replaced them with long puts much further out of the money.  Allianz chose not to accept modest losses and aim to recover in a reasonable time period, opting instead to gamble (with the Trust's money) that the market would rebound immediately and exposing the portfolio to further downside risk.  "In hindsight," Allianz admitted, "*we should have left those positions as is*."

68.     Allianz would not have sold the new-configuration hedges were it acting in the best interests of the Plans' participants and beneficiaries.  Were it doing so, it would have accepted modest losses.  Instead, motivated by the fact that it would earn no compensation until those losses were recovered, Allianz removed the hedge that was supposed to protect the Trust's investment and gambled (with the Plans' assets) that markets would soon recover.  In doing so, Allianz not only abandoned Structured Alpha's supposed hedging strategy but also its purported tenet not to bet on the direction of the market or volatility.

69.     As Allianz acknowledged in contemporaneous email correspondence, these active management decisions also created a "duration mismatch" between the short and long puts that contributed to the portfolio's losses.  This mismatch, Allianz explained, meant that the long puts "couldn't be harvested because they were shorter-dated" and about to expire.  The resulting "theta decay reduced their value," and the puts "did not pay out."  Another problem was that the

cost to replace the expiring long puts increased dramatically as the market declined and volatility spiked.  "We are continually rolling into new long puts as they expire," Allianz wrote, "but there still is a duration mismatch that causes a continued equity decline / vol increase to hurt the mark and vice versa."  Had Allianz purchased and maintained the proper downside protection that it had represented would be in place at all times, it would have had no need to replace expiring long puts at the critical time when they became prohibitively expensive.

70.     In addition to what Allianz admitted to in this correspondence, at least two other imprudent decisions by Allianz inserted excessive risk into the portfolio and contributed to its collapse.

71.     First, Allianz had been chasing additional returns by purchasing cheap puts much further out of the money than Allianz had represented.  Many of those long puts, however, expired worthless in early March.

72.     Second, though Allianz was selling puts and calls on volatility indexes like the VIX, Allianz had purchased *no* long positions on the volatility indexes it was shorting.  Allianz left the portfolio at the mercy of a surge in volatility, which is exactly what happened in February and March 2020.

73.     Allianz left these short positions "naked" even though it knew that the VIX had been displaying increased "sensitivity" to market moves and was therefore prone to sudden, larger-than-anticipated spikes.  The net result was that the Fund's portfolio, going into the volatility spikes of February and March 2020, was *short* volatility in excess of Allianz's strategy representations—reflecting Allianz's gamble that the VIX would remain relatively low.  Allianz made this reckless directional bet despite the supposed pillar of its Structured Alpha investment strategy that it would "never make a forecast on the direction of equities or volatility."

74.     The combination of these and other imprudent actions by Allianz caused the Trust to suffer staggering losses.  By the end of March 2020, the Trust had suffered losses of approximately 75% for the year.  Allianz lost more than $280 million of the Trust's money. These losses far exceed those incurred by the Fund's equity benchmark index, the equity markets more generally, and comparable investment strategies in which the Trust could have invested.

## Allianz Attempts to Whitewash Its Breaches

75.     On July 20, 2020, Allianz published on its website the results of an internal review Allianz claims to have conducted into the "substantial losses" Structured Alpha incurred. The stated purpose of Allianz's review, titled "Structured Alpha March 2020 performance," was "to better understand how the Portfolio's investment and risk management processes operated in the face of the market volatility" experienced at that time.

76.     Allianz's account purports to describe certain of its actions in March 2020. "During the eleven trading days between March 2 and March 16," Allianz says, "there were at least four instances" in which it restructured the short puts on the S&P 500 "by both reducing the strike prices of the put options and by decreasing the number of positions held."  "Similarly, the portfolio managers replaced short-term short VIX calls with new longer-term short VIX calls at more distant strike prices.  An analogous process occurred for short VXX calls," according to Allianz.  But "commencing on March 12, 2020, the Portfolio Management team stopped relayering new short puts on the [S&P 500] and [Nasdaq], and short calls on the VIX and VXX to further reduce the risks in the portfolio."

77.     These details confirm that Allianz was betting on a market rebound by continuing to relayer short positions during the critical time period when Allianz should have been mitigating risk, not compounding it.  What is new, however, is Allianz's admission that it was relayering risk-bearing positions all the way until March 12.  Only then did Allianz stop

exposing the portfolio to further losses by refraining from selling more insurance against an additional market decline or volatility event.

78.     Allianz claims in its July 2020 report that it was "obligat[ed] to investors to pursue returns" in the first half of March 2020 rather than "convert[] to cash."  But Allianz was not obligated to layer additional risk into the portfolio so it could bet on a market rebound or decline in volatility.  Allianz could have, for example, converted to cash or cash equivalents (as it had discretion to do under the PPM), especially to assist in the preservation of capital on a temporary basis.

79.     The most jarring aspect of Allianz's July 2020 report is how different the strategy Allianz now describes is compared to the one it had represented to the Plan Fiduciary.

80.     Allianz's report claims that the risks of investing in Structured Alpha were "fully disclosed, including the risk of total loss."  That assertion contradicts Allianz's prior representations of how it would manage the portfolio to avoid significant losses.  It also contradicts Allianz's specific representation that the new hedging configuration would lock in a "Max Loss" for the Fund.

81.     Allianz's report also claims that the hedges were designed to offer only "some protection" in the event of a market crash.  The hedges, Allianz now insists, were "not intended to provide broader protection against all market downturns, particularly downturns that transpire over longer periods of time."  Rather, they were "deliberately constructed with options that were both of relatively short expiration and far out of the money" only to "protect against a ***one-day market shock***."

82.     Allianz never disclosed these limitations.  To the contrary, Allianz characterized the hedges as reinsurance that would be in place "at all times" in order to "protect the portfolio in

the event of a market crash." It emphasized to the Plan Fiduciary that its investment strategy was designed to generate returns even when equity indexes "fall more than normal over a multi-week period." Allianz's after-the-fact description of the hedges as a partial backstop—protecting only against a "one-day market shock" but nothing else—is inconsistent with its prior representations.

83.    Allianz's July 2020 report claims that because the hedges were constructed to protect only "against a one-day market shock," Allianz properly "mitigated" portfolio risk through restructuring.

84.    Yet Allianz told the Plan Fiduciary that when it was building positions in a low-VIX environment (like that which existed at the start of 2020), the new-configuration hedges would not only protect against a market decline but predefine a set maximum loss. According to Allianz, these new-configuration hedges were supposed to create "sealed" spreads that would need *no restructuring* during the life of the position. Allianz's postmortem omits any mention of the new-configuration hedges that should have been locked in place to define a "Max Loss."

85.    Allianz's July 2020 report claims further that Allianz's "Enterprise Risk Management function" stress tested the portfolio against "*single day* scenarios" only. But Allianz represented to the Plan Fiduciary that it designed its risk management program to account for the portfolio's "ability to withstand a multi-week extreme statistical path in the underlying indices or asset classes," (e.g., an extreme multi-week drop in the S&P 500 or spike in the VIX), and that as part of its risk management efforts it would "continually model[] and analyz[e]" the effect on the portfolio of a "multi-week market dislocation." Allianz specifically represented, in fact, that it "use[d] proprietary quantitative tools to stress-test positions at both the individual and portfolio levels" and that it did so "[f]or the multi-week scenario." If single-day stress testing was all that Allianz was *actually* doing, as implied by its July 2020 report, then

its imprudence speaks for itself: such testing would not permit Allianz to evaluate, let alone manage, risk in a multi-day or multi-week market decline.

86.     Contrary to Allianz's July 2020 report, Allianz had previously assured the Plan Fiduciary that Allianz's proprietary scenario and stress testing models enabled it to stress-test the entire portfolio for *any* market scenario—including "'what if' scenarios which far exceed any historically observed events."  Allianz claimed that the use of these models was integral to the successful day-to-day management of Structured Alpha.  Again, Allianz's postmortem is inconsistent with the risk profile of Structured Alpha that Allianz disclosed to the Plan Fiduciary.

87.     Allianz also included in its July 2020 report a graph providing a "representative depiction of a portion of the composition" of one of the Structured Alpha funds as of "February 2020":



88.     This graph depicts an investment strategy that is inconsistent with the one Allianz assured the Plan Fiduciary it would follow to pursue "risk-managed" returns.  Allianz never disclosed this graph—or anything like it—before Structured Alpha's disastrous results in 2020.

If it had, the Plan Fiduciary would not have maintained the Trust's significant investment in the Fund.

89.     Allianz's July 2020 graph illustrates that Allianz bought downside hedges well beneath the strike price (*i.e.*, "-10% to -25%" below-the-market level) at which it said it would buy hedges.  While Allianz inexplicably claims this was "deliberate[]," its failure to buy the hedges it said it would added excess risk to the portfolio, leaving the Fund exposed to the catastrophic losses that occurred in February and March 2020.

90.     Allianz's July 2020 graph also illustrates the absence of any new-configuration hedges, *i.e.*, the hedges that Allianz said it would buy closer to market levels in order to lock in a "Max Loss" in the case of a market decline.  These are nowhere to be found in Allianz's graph (just as all discussion of them is missing from Allianz's commentary), although Allianz had said it had deployed this refinement to its investment strategy to make the Fund's portfolio more resilient to market declines.

91.     Allianz's July 2020 graph also shows that potential returns from the strategy's options component (illustrated in blue in the annotated version of Allianz's graph below) came at the cost of potentially massive, unhedged losses (illustrated in red below) if the market declined. The downside exposure depicted in Allianz's July 2020 chart is contrary to Allianz's description of Structured Alpha's investment strategy to the Plan Fiduciary.



**Example of payoffs by strategy in the Structured Alpha 1000 Fund for S&P 500 options**
February 2020

92.     Importantly, Allianz's graph depicts only equity index options on the S&P 500. In its July 2020 report, Allianz chose not to illustrate the "strategy payoffs" from the short volatility options it sold on the VIX and VXX in violation of its promise "never" to make a bet on the direction of volatility.  Had it included a graph of that strategy, it would show the potential for limited, modest payoffs if Allianz bet correctly and ***unlimited*** losses if it did not.  Allianz has offered no explanation for why it made that wager with the Trust's money or how the disastrous losses it caused them as a result were consistent with the investment strategy Allianz claimed to pursue.

### COUNT I: BREACH OF FIDUCIARY DUTY – ERISA § 404

93.     Plaintiff restates and realleges paragraphs 1-92 as though fully set forth herein.

94.     Plaintiff brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Plan Fiduciary has the authority to bring this

Count under these provisions because it is the named fiduciary under ERISA of the Plans whose assets are held in the Trust.

95.     At all relevant times, Allianz was a fiduciary within the meaning of ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) because it exercised authority or control with respect to the management or disposition of the Plans' assets invested in the Fund.  In addition, Allianz was expressly delegated and expressly accepted ERISA fiduciary duties with respect to the management of the Plans' assets invested in the Fund.

96.     At all relevant times, Allianz was also an investment manager within the meaning of ERISA § 3(38) (29 U.S.C. § 1002(38)).  Allianz was a fiduciary with the power to manage or dispose of the Plans' assets invested in the Fund.  Allianz was a registered investment adviser under the Investment Advisers Act of 1940.  And Allianz acknowledged in writing that it was a fiduciary with respect to the Plans whose assets are invested in the Fund.  Allianz did so, for example, in its contracts with the Trust and the Plan Fiduciary, including the Side Letter Agreement.

97.     By executing the contracts establishing Allianz as an investment manager within the meaning of ERISA, the Trust, acting on the authority of the Plan Fiduciary, appointed Allianz to manage Plan assets under ERISA § 402(c)(3) (29 U.S.C. § 1102(c)(3)).  That appointment entitles the Plans to the benefits and protections of ERISA § 405(d)(1) (29 U.S.C. § 1105(d)(1)).

98.     At all relevant times, the Fund constituted "plan assets" under ERISA § 3(42) (29 U.S.C. § 1002(42)) because 25% or more of the total value of each class of equity interest was held by benefit plan investors within the meaning of ERISA and its implementing regulations.

99.     At all relevant times, Allianz was managing the Fund holding or containing plan assets and acting in a fiduciary capacity.

100.    As a fiduciary, Allianz owed a duty of care under ERISA § 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)).  That duty required Allianz to manage the Plans' assets "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

101.    As a fiduciary, Allianz owed a duty of loyalty under ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)).  That duty required Allianz to manage the Plans' assets "solely in the interest" of and for the "exclusive purpose of providing benefits" to the participants and beneficiaries of the Plans whose assets were invested in the Fund.  The duty of loyalty also required Allianz to not mislead the Plan Fiduciary about Structured Alpha or Allianz's management of the strategy and to disclose material facts whose omission would create a false impression about the strategy or Allianz's management of it.

102.    As a fiduciary, Allianz owed a duty of diversification under ERISA § 404(a)(1)(C) (29 U.S.C. § 1104(a)(1)(C)).  That duty required Allianz to ensure the Plans' assets invested in the Fund were adequately diversified "so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

103.    And as a fiduciary, Allianz owed a duty to follow the Plans' governing documents under ERISA § 404(a)(1)(D) (29 U.S.C. § 1104(a)(1)(D)).  That duty required Allianz to manage the Plans' assets "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA.

104.    The fiduciary duties under ERISA are "the highest known to the law." *Donovan*

*v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

105.    Allianz breached its fiduciary duties.  Allianz's breaches include, without

limitation, the following:

(a)    Allianz breached its duties to prudently manage the Plans' assets or

manage them according to the best interests of the Plans' participants and beneficiaries when it

failed to put and maintain the appropriate hedges in place to protect the assets during a market

decline.  This failure added excess and undisclosed risk and was contrary to Allianz's

representations that the hedges would be in place "at all times" as "reinsurance" for the Fund's

portfolio.

(b)    Allianz breached its duties to prudently manage the Plans' assets or

manage them according to the best interests of the Plans' participants and beneficiaries when it

sold the new-configuration hedges and took on new risk-bearing positions starting in late-

February 2020.  These discretionary restructurings exposed the Trust's investment in the Fund to

further downside risk and were contrary to Allianz's representations, including that it would not

sell the new-configuration hedges that should have been locked in to safeguard the Plans' assets.

Allianz's restructurings were motivated by a desire to recoup its fees more quickly and not the

best interests of the Plans' participants and beneficiaries.  Had Allianz been acting in their best

interests, Allianz would have accepted modest losses rather than relayering risk into the portfolio

and gambling (with the Trust's money) that the markets would soon recover.

(c)    Allianz breached its duties to prudently manage the Plans' assets or

manage them according to the best interests of the Plans' participants and beneficiaries when it

represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Trust to unlimited losses.

(d)     Allianz breached its duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)     Allianz breached its duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Plan Fiduciary, decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Fund's portfolio, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when, unbeknownst to the Plan Fiduciary, Allianz decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that its short and long positions would be of relatively equal duration and added excess and undisclosed risk to the Fund's portfolio.  Allianz created this duration mismatch not because it was in the best interests of the Plans' participants and beneficiaries, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it, unbeknownst to the Plan Fiduciary, decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Fund's portfolio, again in an apparent effort to enhance its fees.

(i)     Allianz breached its duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it caused the Plan Fiduciary to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached its duty to ensure the Trust's investment was prudently diversified when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to the Trust's investment.

106.    As a direct and proximate result of Allianz's breaches of its fiduciary duties under ERISA, the Trust suffered devastating losses, with the exact amount to be proven at trial. Allianz's breaches, including actions taken in its own self-interest, also caused it to earn substantial fees and profits.

## COUNT II: PROHIBITED TRANSACTION – ERISA § 406

107.    Plaintiff restates and realleges paragraphs 1-106 as though fully set forth herein.

108.    The Plan Fiduciary brings this Count under ERISA §§ 502(a)(2), (a)(3), and 409(a) (29 U.S.C. §§ 1132(a)(2), (a)(3), and 1109(a)).  The Plan Fiduciary has the authority to bring this Count under these provisions because it is a fiduciary under ERISA of the Plans whose assets are held in the Trust.

109.    A fiduciary may not engage in certain prohibited transactions under ERISA § 406(b) (29 U.S.C. § 1106(b)).  For instance, a fiduciary "shall not deal with the assets of the plan in his own interest or for his own account."

110.    Allianz violated ERISA § 406(b) (29 U.S.C. § 1106(b)), including by managing the Plans' assets in its own self-interest and not for the exclusive purpose of providing benefits to the Plans' participants and beneficiaries.  Allianz managed the Fund to maximize its own fees— adding excess and undisclosed risk to the portfolio in the process—rather than for the sole interest of safeguarding the Trust's investment.  Allianz did so at least by constructing the portfolio to be largely unhedged in the January and February 2020 timeframe and then, when the market declined in February and March 2020, adding more risk to the portfolio to chase return (and thus fees) rather than safeguarding the Trust's investment.   Allianz acted in its own self-interest to recover its fees as quickly as possible, and not in the best interests of the Plans' participants and beneficiaries, when Allianz refused to accept more modest losses and instead relayered additional risk into the portfolio and gambled (with the Trust's money) on a market rebound.

111.    As a direct and proximate result of Allianz's violations of ERISA § 406(b) (29 U.S.C. § 1106(b)), the Trust suffered devastating losses, with the exact amount to be proven at trial.  Allianz's violations also caused it to earn substantial fees and profits.

34

## COUNT III: BREACH OF CONTRACT

112.    Plaintiff restates and realleges paragraphs 1-111 as though fully set forth herein.

113.    In connection with the Trust's investment in the Structured Alpha Funds, the Plan Fiduciary and Allianz entered into a Side Letter Agreement.  The Trust is a third-party beneficiary of the Side Letter Agreement, including because certain obligations Allianz owes under this agreement are owed to the Trust.

114.    The Trust's investment in the Fund was also subject to an LLC Agreement, PPM, and Subscription Agreement by which the Trust's assets were invested in the Fund (together with the Side Letter Agreement, the "Fund Agreements").

115.    The Fund Agreements are valid and enforceable contracts.

116.    The Plan Fiduciary and the Trust have performed their obligations under the Fund Agreements.

117.    Under the Fund Agreements, Allianz promised, among other things, to comply with "the obligations and liabilities imposed on fiduciaries by ERISA," including the duties of care and loyalty.  In this regard, Allianz agreed to manage the Fund prudently and for the benefit of the Trust.

118.    Allianz breached its obligations under the Fund Agreements.  Allianz's breaches include, without limitation, the following:

(a)    Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it did not put the appropriate hedges in place to protect the assets during a market decline. This failure added excess and undisclosed risk and was contrary to Allianz's representations that the hedges would be in place "at all times" as "reinsurance" for the Trust's portfolio.

(b)      Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it sold the new-configuration hedges and took on new risk-bearing positions starting in late-February 2020.  These discretionary "restructurings" exposed the Trust's investment to further downside risk and were contrary to Allianz's representations, including that it would not sell the new-configuration hedges that should have been locked in to safeguard the investment. Allianz's restructurings were motivated by a desire to recoup its fees more quickly and not the best interests of the Plans' participants and beneficiaries.  Had Allianz been acting in their best interests, Allianz would have accepted modest losses rather than relayering risk into the portfolio and gambling (with the Trust's money) that the markets would soon recover.

(c)      Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it had constructed the portfolio in a way that would ensure a defined "Max Loss" and then managed the strategy in a way that exposed the Trust's investment to unlimited losses.

(d)      Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it either failed to have adequate risk management measures in place or abandoned such measures.

(e)      Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it represented that it would manage the Structured Alpha strategy in such a way to eliminate the risk of margin calls yet implemented a strategy in which that very risk materialized.

(f)     Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when, unbeknownst to the Plan Fiduciary, Allianz decided to purchase puts that were further out of the money than the maximum range Allianz had disclosed, thus adding excess and undisclosed risk to the Trust's portfolio, in an apparent effort to increase Allianz's fees.

(g)     Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when, unbeknownst to the Plan Fiduciary, Allianz decided to purchase puts that expired sooner than the puts it sold.  This practice was contrary to Allianz's representations that its short and long positions would be of relatively equal duration and added excess and undisclosed risk to the Trust's portfolio.  Allianz created this duration mismatch not because it was in the best interests of the Plans' participants and beneficiaries, but because doing so allowed Allianz to enhance its fees.

(h)     Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when, unbeknownst to the Plan Fiduciary, Allianz decided to sell volatility index options without buying any corresponding hedge, adding excess and undisclosed risk to the Trust's portfolio, again in an apparent effort to enhance its fees.

(i)     Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it caused the Plan Fiduciary to believe that Structured Alpha's risk profile was consistent with Allianz's stated investment strategy rather than the actual risk profile, either by making false or misleading representations about Structured Alpha or failing to disclose information

necessary to correct prior representations that were inconsistent with how Allianz was actually managing the strategy.

(j)     Allianz breached contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it operated a strategy that was unduly weighted towards being short volatility in February and March 2020 (contrary to its pledge not to make directional bets) and created excess and undisclosed correlated risks to the Trust's investment.

(k)     Allianz breached its contractual duties to prudently manage the Plans' assets or manage them according to the best interests of the Plans' participants and beneficiaries when it failed to have or maintain structural risk protections in place and failed to purchase and maintain hedges that would afford such protection to the portfolio.

119.     As a direct and proximate result of Allianz's breaches of the Fund Agreements, the Trust sustained actual damages, with the exact amount to be proven at trial.

## PRAYER FOR RELIEF

The Plan Fiduciary requests that the Court enter judgment in its favor against Allianz and an Order granting the following relief:

A.     Restoration of all losses to the Trust, in an amount to be proven at trial, resulting from the foregoing breaches and violations of ERISA;

B.     Accounting and disgorgement of fees and profits, in an amount to be proven at trial;

C.     A money judgment exceeding $75,000, in an amount to be proven at trial;

D.     An order awarding pre- and post-judgment interest;

E.     Attorney's fees and costs under ERISA § 502(g) (29 U.S.C. § 1132(g)); and

F.      Any such other legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.  *See* Fed. R. Civ. P. 38(b).

Dated: April 9, 2021                        Respectfully Submitted,

                                            By: /s/ *Daniel Z. Goldman*  _____

                                            Daniel Z. Goldman
                                            PETRILLO KLEIN & BOXER LLP
                                            655 Third Avenue, 22nd Floor
                                            New York, NY 10017
                                            Phone: (212) 370-0330
                                            dgoldman@pkbllp.com


                                            By:  /s/ *Sean W. Gallagher*  _____

                                            Sean W. Gallagher (*pro hac vice forthcoming*)
                                            Adam L. Hoeflich (*pro hac vice forthcoming*)
                                            Mark S. Ouweleen (*pro hac vice forthcoming*)
                                            Abby M. Mollen (*pro hac vice forthcoming*)
                                            Nicolas L. Martinez (*pro hac vice forthcoming*)
                                            Dawson K. Robinson (*pro hac vice forthcoming*)
                                            BARTLIT BECK LLP
                                            54 West Hubbard Street, Suite 300
                                            Chicago, IL 60654
                                            Phone: (312) 494-4400
                                            sean.gallagher@bartlitbeck.com
                                            adam.hoeflich@bartlitbeck.com
                                            mark.ouweleen@bartlitbeck.com
                                            abby.mollen@bartlitbeck.com
                                            nicolas.martinez@bartlitbeck.com
                                            dawson.robinson@bartlitbeck.com

                                            *Attorneys for the Raytheon Technologies*
                                            *Corporation Pension Administration and*
                                            *Investment Committee*